## Case No. 4,937.

### The FOREST KING.

[Blatchf. Pr. Cas. 45.] [1]

District Court, S. D. New York. Aug., 1861.[2]

BETTS, District Judge. The schooner Forest King, her tackle, &c., and cargo were captured on the 13th day of June, 1861, in the harbor of Key West, by the United States flag-ship Mississippi, under command of William Mervine, flag-officer. The libel charges that various other vessels of the United States were in sight at the time of such capture, and that the master of the schooner had notice and due warning of the blockade of the port of Key West, yet entered such port and violated the blockade thereof, whereby the schooner and her cargo became liable to condemnation as lawful prize; that the cargo laden on the schooner was enemy's property and liable to seizure and condemnation as such. The owners of the vessel, alleging that she was held in separate shares, all but four thirty-second parts, or one-eighth part, by residents in the state of Massachusetts, and that the one-eighth share is owned by a resident in Darien, Georgia, intervene and claim the vessel as an American bottom, owned by citizens of the United States, and deny that she is subject to seizure by reason of any charges in the libel contained. They state that she sailed under a charter-party dated at New York, January 17, 1861, for a voyage to Rio Janeiro, in Brazil, and back to an Atlantic port of the United States north of Cape Hatteras, or Gulf port of discharge in the United States, (Philadelphia and Boston excepted,) took on board

---

1 [Reported by Samuel Blatchford, Esq.]
2 [Affirmed by circuit court. Case not reported.]

a cargo of coffee in bags, and sailed from that port April 20, last past, bound to New Orleans; that having learned that the Mississippi was blockaded, she altered her course and spoke the blockading squadron at Pensacola for information, and there had a warning indorsed on her register against entering Pensacola, or any other port south of the Delaware, as they were all blockaded; that the schooner on June 30 entered the port of Key West to obtain supplies, and for no other purpose; and that the vessel was there seized as prize. The claimants also interpose exceptions similar in substance to those taken in other antecedent causes to the course and validity of the suit and the jurisdiction of the court.

The firm of Rostron, Dutton & Co., trading at Rio Janeiro, and of Richard Rostron & Co., (through their agent,) of Manchester, England, British subjects, intervene and claim the whole cargo seized, and deny that the master was their agent, in relation of the cargo, in the navigation of the ship; that any of the owners of the cargo were and are enemies of the United States; that they had any knowledge or notice that Key West was blockaded, or that they attempted or intended to violate any blockade in the importation of the above cargo; and a commercial agent of theirs verifies the statement of their interest in the claim by his test affidavit.

Upon the issues and proofs, it appears to the court that no rightful cause of seizure is established against the cargo that was shipped, by two bills of lading, dated April 16, 1861, at Rio Janeiro, by the claimants, to P. A. Giraud & Co., or to their assigns, in New Orleans. Two causes of seizure are alleged against the cargo: First, that it was the property of citizens and residents of a blockaded port, and belonged to the consignees, who are enemies of the United States; and, secondly, that the ship, with knowledge that the port was blockaded, attempted to violate the blockade; and it would seem, further, to be urged that she was confiscable for afterwards entering Key West under formal warning.

Supposing the rule is not definite, whether the consignors or consignees shall, in presumption of law, be deemed owners of goods in transitu, on affreightment, evidence is furnished, in this case, which relieves that uncertainty, and shows that the cargo was shipped as English property by the consignors. It is so stated in the test oath by the agents of the owners, and also in the affidavits made before the British consul in Rio Janeiro, upon the bills of lading, at the time of their execution; and the consignors assumed control of the consignment in written instructions directed to the master after the vessel sailed, and which were taken with the ship's papers. These supply but slight facts, but are sufficient to indicate that the property was not intended to vest in the consignees, but remained at the control of the ship-

pers on the voyage; and it belonged to the captors to give evidence changing that presumption. Had the evidence, then, convicted the master of an intent to violate the blockade, it would not affect the neutral cargo, because he is not shown to have been agent of the owners of the cargo, so as to render his illegal act binding upon them, or to subject their property to his control. The cargo, therefore, must be restored to the claimants, but, the ship being in part confiscable for other cause, the captors are not responsible to the claimants for damages because of the arrest of the cargo, that having been placed at the risk of the owners, in a bottom liable to seizure and condemnation by the prize law.

I do not think adequate proof has been given by the libellants to convict the schooner of a wilful attempt to violate the blockade after notice thereof. The voyage round was undertaken at New York, in January, 1861, and the cargo was laden on board, and the vessel cleared on the voyage in question, at Rio Janeiro, on or about the 16th day of April, 1861, so nearly coincident with the earliest public act of the president of the United States recognizing the commencement of public hostilities by the insurgents against the United States, and the proclamation by Jefferson Davis, president of the Confederate States, announcing such hostilities, that it would, on account of the distance of the United States and Brazil apart, be impossible for actual notice to have reached the claimants that their shipment could not legally be directed to New Orleans. Prize courts regard physical disabilities of that character, in judging the bona fides of commercial operations, and forbear exacting from neutrals that exactitude, in conforming to the instructions or conduct on very remote adventures, which would be enforced in those within reasonable proximity. The Betsey, 1 C. Rob. Adm. 332; Wheat. Capt. 194, and cases cited.

The master testifies that he approached Pensacola to ascertain the fact whether a port could be entered in that vicinity free from blockade, and that he, in making that attempt, received the first formal notice of the blockade of that section of the coast and up to the capes of the Delaware. I consider that his conduct in making the inquiry or search he did was blameless. So, also, I regard it as within the fair spirit of the doctrine adverted to that the master, under the information and suggestions given by officers of the United States blockading squadron off that coast at the time he was warned off, that he could properly go into Key West for supplies or stores, committed no evasion of the blockade of that port in entering therein. This is recognized by Lord Stowell as a fair and reasonable excuse for the entering of a blockaded port (The Neptunus, 2 C. Rob. Adm. 110) by a vessel acting in good faith on such notice; and as no claim for further

proof has been made to the court to correct or impeach the testimony to this point, I shall accept the statement as true, and presume that the schooner was taken by her master into Key West for the purpose of obtaining supplies necessary to the voyage. Neither he nor his mate seems to have been required, on the preparatory examinations, to specify the wants of his vessel at Key West, or whether or not they were obtained by her. I must, on the case as it stands, regard the object of her visiting Key West as admitted to be that stated by the witnesses in their examination in preparatorio. The visit was for an allowable object, and the doings of the master do not therein compromise the safety of the vessel. The extra extent of the voyage to be performed renders probable the assertion that the vessel required further stores, and, at all events, removes the suspicions that generally apply to such excuses. The Fortuna, 5 C. Rob. Adm. 27; The Hurtige Hane, 2 C. Rob. Adm. 124.

I shall, accordingly, reject the application to condemn the vessel in full, and direct seven-eighths of the value to be restored to the loyal owners named as claimants. One-eighth of the value of the vessel owned by a claimant resident in the state of Georgia, being enemy's property, is condemned, with costs; and, part of the vessel being rightfully seized as enemy's property, the owners of the cargo are not entitled to costs against the captors.